**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| TRUGREEN COMPANIES, L.L.C., a Delaware limited liability company, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>SCOTTS LAWN SERVICE, et al.,<br><br>     Defendants. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION TO STRIKE EXPERT REPORT, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:06CV00024 |

Both parties in this case have moved for summary judgment on whether defendants are liable to plaintiffs for breach of contract, intentional interference with contractual relations, intentional interference with economic relations, and unfair competition. On the record that has been developed, this case is not amenable to complete resolution on summary judgment. Numerous material facts dealing with the primary players in this action remain disputed, and, barring settlement, will have to be resolved at trial. Nevertheless, the court finds that a few claims are ripe for resolution.

First, the court finds that defendants Jason Beck, Paul Brower, Richard Coffman, Alfreda Egbert, Margie Smith, Jessica Spencer, Shannon Christensen, James Murray, and Matt Walker (the "New Utah Employees") are entitled to summary judgment on TruGreen's claims against them for both breach of contract and intentional interference with existing and prospective economic relations. This conclusion is warranted if not for the sole reason that TruGreen elected

not to address these defendants' claims in its opposition and other memoranda. However, even if TruGreen had addressed these issues, the plain language of the employee contracts and the lack of evidence showing contact between these employees and former or current TruGreen employees and customers supports summary judgment in the defendants' favor. Being that these are the only two claims asserted against the New Utah Employees, the court eliminates these defendants from the case.

Second, the court finds that all of the remaining employee defendants – Ryan Mantz, Lary Gaythwaite, Jim LeBlanc, David Stephensen, Jason Hiller, James Clogston, Rick Deerfield, David Van Acker, and Tammy Roehr – are entitled to summary judgment on TruGreen's claims of intentional interference with existing and prospective economic relations. There is little direct evidence of actual post-employment contact between these Scotts employees and current or former customers of TruGreen, and even when contact or possible diversion was shown, no reasonable juror could conclude from the evidence supplied that any contact or diversion by these defendants was done with an improper purpose or by improper means, as required by both Utah and Idaho law.

Third, with respect to TruGreen's contract claims, the court finds the following: (1) Mantz and Stephensen are entitled to summary judgment on Trugreen's claim for breach of the non-competition provision because even if these defendants' most recent non-compete agreements are enforceable under Utah law, neither provision prohibits post-employment competition; (2) LeBlanc, Stephensen, Clogston, Deerfield, Van Acker, and Roehr are entitled to

summary judgment on the claim for breach of the non-interference provision because there is no evidence that these defendants induced or encouraged TruGreen employees to leave TruGreen; and (3) Mantz, Gaythwaite, LeBlanc, Stephensen, Hiller, Clogston, Deerfield, Van Acker, and Roehr are entitled to summary judgment on TruGreen's claim for breach of the non-solicitation provision because there is no evidence that they solicited or contacted TruGreen customers with whom they had actual contact while employed by TruGreen.

Also before the court is Scotts' motion to strike TruGreen's expert report and evidence of damages (#202).  The court finds that Mr. Elggren's conclusions in this case are not sufficiently reliable to survive scrutiny under Rule 702 of the Federal Rules of Evidence.  Consequently, the court GRANTS Scotts' motion to strike TruGreen's expert report (#202) and will preclude testimony from Mr. Elggren at trial.

Because the court denies TruGreen's summary judgment motion without having to strike any of the challenged facts or testimony, the court finds the following motions by Scotts to be MOOT, unless specifically addressed in the decision below: motion to strike affidavit and deposition testimony supporting TruGreen's motion for summary judgment (#217); motion to strike portions of affidavit of Adam Close and deposition testimony of Bradley Roach (#228); motion to strike evidence relied on by TruGreen in its summary judgment reply memorandum (#245).

As explained above and outlined in more detail below, the court GRANTS in part and DENIES in part Scotts' motion for summary judgment (#175; #181; #183; #185; #187) and

GRANTS Scotts' motion to strike TruGreen's expert report and evidence of damages (#202).

The court DENIES TruGreen's motions for summary judgment (#151 and #177).

## FACTUAL BACKGROUND

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.[1]  Rather than recite the entire backdrop of this case, the court briefly recites the facts relevant to this order.  For the purpose of resolving these competing motions for summary judgment, the court finds the following facts.

### General Background

Trugreen is a lawn care company with offices throughout the United States.  It is the nation's largest provider of residential lawn care and undertakes substantial marketing and sales efforts to establish and maintain its customer base.  Employing many full-time individuals, TruGreen utilizes sales representatives who are responsible for selling TruGreen programs and services, compiling lists of prospective customers, engaging in person-to-person contacts by telephone and neighborhood marketing efforts, and following up with customer inquiry leads.  The branch marketing managers at TruGreen plan, direct, and coordinate marketing and sales efforts and the branch managers have general oversight and control of a branch office.  TruGreen asserts that each employee receives an extensive and consistent regiment of specialized and confidential training, but defendants maintain that the training of the named employees in this

---

[1] *Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

action was minimal.  Trugreen requires its employees to sign confidentiality and non-competition

contracts as a condition of their employment.

The current dispute arose when Ryan Mantz, a former branch manager of Trugreen's

Ogden branch, voluntarily resigned from Trugreen on or about November 1, 2005.  Within weeks

of leaving, Mantz began working for Scotts in Ogden, Utah, one of Trugreen's direct

competitors.  Mantz allegedly began recruiting other Trugreen employees to join him at Scotts.

From November 2005 to the present, a number of TruGreen employees have left to work for

Scotts.  The following groups of defendants are all former TruGreen employees that worked for

Scotts after leaving TruGreen.

### The "New Utah Employees"

Jason Beck, Paul Brower, Richard Coffman, Alfreda Egbert, Margie Smith, Jessica

Spencer, Shannon Christensen, James Murray, and Matt Walker are all former employees of

TruGreen that have recently worked for Scotts.  Each of these employees began working for

TruGreen at various times, one starting as early as 1996, and they all left TruGreen in either 2005

or 2006.  During their employment with TruGreen, employees Beck, Brower, Coffman, Egbert,

Smith, and Spencer, respectively, all signed one and only one, non-compete agreement in favor

of TruGreen.  Each of the agreements signed by these employees contained a non-competition

provision that reads:

> During Employee's employment with TruGreen, the Employee shall not, without the
> express written approval of TruGreen's President, Chief Operating Officer, or
> General Counsel, directly or indirectly, own, manage, participate in or otherwise
> engage or have any connection with any business which provides any service or

product that, to the Employee's knowledge, is provided or proposed to be provided by TruGreen.

In addition to this non-competition provision, each of the agreements contained provisions covering the solicitation of TruGreen customers, interference with TruGreen employees, and the disclosure of confidential information.  The non-solicitation provision reads:

> (b) <u>Non-solicitation</u>.  During Employee's employment with TruGreen and for a period of one (1) year following the termination of such [employment], . . . Employee will not, . . . directly or indirectly, on behalf of himself or others, solicit in any manner (with the intent of directly or indirectly providing any service or product competitive with the service or product which is provided by TruGreen . . . ) any TruGreen customer with whom Employee had actual contact with while employed by TruGreen.

The agreements also contain a non-interference provision:

> (c) <u>Non-Interference</u>.  Employee shall not directly or indirectly induce or encourage (i) any TruGreen employee or contractor to leave his/her position or to seek employment or association with any person or entity other than TruGreen . . . .

Each of the agreements also contain provisions regarding confidential information:

> The parties agree that Employee is or is about to be employed by TruGreen in a capacity which may permit Employee to have access to confidential information not generally known to the public, including Trade Secrets, in which TruGreen has invested substantial time, money and effort in developing and thus has a valuable property interest in, including but not limited to, marketing and sales techniques, product and equipment information, financial data, billing rates, formulas, methods, theories, manuals, customer expectations and customer data (collectively "Confidential Information").  A "Trade Secret" is any information (whether or not written or stored in any medium) that derives independent economic value from not being generally known to, or being readily ascertainable through proper means, by the public . . . .
>
> . . . .
>
> 4. <u>Confidentiality/Non-Disclosure</u>

6

      (a)  <u>Non-Disclosure of Confidential Information</u>.  Employee acknowledges that during the course of performing Employee's duties hereunder, Employee will have access, and has heretofore had access, to TruGreen's Confidential Information. Employee, while in TruGreen's employ or at any time thereafter, will not . . . directly or indirectly communicate or divulge, or use for Employee's own benefit or for the benefit of any other person or entity, any Confidential Information which Employee acquired during the course of Employee's employment with TruGreen . . . .

      (b)  <u>Return of Information</u>.  Promptly after the termination of Employee's employment with TruGreen or upon TruGreen's request at any time (whichever occurs earlier), Employee will deliver to TruGreen all business related documents including, but not limited to, originals and copies of memoranda, customer lists, materials relating to procedures, samples, records, documents, contracts, formulas, computer programs, product information and any other Confidential Information which Employee has obtained while employed by TruGreen.

Shannon Christensen, James Murray, and Matt Walker are also former employees of TruGreen that subsequently worked for Scotts.  Unlike the New Utah Employees discussed in the preceding paragraph, these employees all signed at least two non-competition agreements.

Murray signed a confidentiality agreement with TruGreen on March 21, 2001, in which he agreed not to take certain materials with him when he left TruGreen or to encourage other employees to terminate their relationships with TruGreen.  On January 13, 2003, Murray signed an employee confidentiality/non-compete agreement with Trugreen which stated that while he was employed with TruGreen he would not work for any other company that was in competition with TruGreen.  The contract also contained non-solicitation and non-interference provisions, which applied for a year following Murray's employment.  On March 22, 2004, Murray signed the same contract again.

Christensen signed an employee confidentiality/non-compete agreement on May 5, 2000, in which she agreed that for six months following her termination with TruGreen she would not work for a company within the same geographic region that was in direct competition with TruGreen.  The May 5 contract also contemplated non-disclosure, non-solicitation, and confidentiality provisions.  Christensen later signed another employment agreement, at the request of TruGreen.  This contract also included non-disclosure, non-compete, and non-solicitation provisions.  Notably, however, this second contract stated that Christensen's non-competition agreement was only valid while she was employed with TruGreen.

On January 4, 1999, Walker signed an employee confidentiality/non-compete agreement in which he agreed that for six months following his termination with TruGreen he would not work for a company within the same geographic region that was in direct competition with TruGreen.  The January 4 contract also contemplated non-disclosure, non-solicitation, and confidentiality provisions.  On October 23, 2003, Walker signed another employment agreement, at the request of TruGreen.  This contract also included non-disclosure, non-compete, and non-solicitation provisions.  Notably, however, this second contract stated that Walker's non-competition agreement was only valid while he was employed with TruGreen.

Murray, Walker, and Christensen, after starting their new employment at Scotts and between February 2005 and May 2006, each received a letter from TruGreen reminding them of the employment contract they had signed with TruGreen.  Each of the three letters referenced only the most recent contract signed by the former employees and specifically mentioned the

8

confidential information and solicitation provisions of that contract.  Copies of the most recent agreements signed by these employees were sent as attachments to the letter.

The New Utah Employees did not take any documents or information belonging to TruGreen when they left and have not disclosed any TruGreen documents or materials belonging to TruGreen.  None of the employees remember any specific customer, financial, sales, marketing, training, or other information that they may have seen or heard while employed by TruGreen, and they have not used or disclosed any such information while working for Scotts. Since going to work for Scotts, these employees have not contacted anyone they know to be a TruGreen customer for the purpose of soliciting business.  Also, the New Utah Employees have not induced or encouraged any TruGreen employee to leave TruGreen or go to work for Scotts. Lastly, these employees have not encouraged any current or former TruGreen employee to violate the terms of any agreement that they have with TruGreen.

### The "Utah Employees"

Ryan Mantz started working for TruGreen in 1993 and has worked for TruGreen in various positions and in various geographic areas for over twelve years.  He spent his last years of employment with TruGreen working as the Ogden Branch Manager.  In October 2005, Mantz left TruGreen and started working for Scotts as the branch manager of Scott's Salt Lake City franchise, and is also recognized to be the regional marketing manager.

While employed at TruGreen, Mantz entered into at least two non-compete agreements. The first agreement, signed on April 19, 1993, includes a non-competition provision that reads:

> During the six month period immediately following the termination of my employment with TruGreen, I will not, within any geographic area in which I was assigned duties during the last six months of my employment with TruGreen, directly or indirectly become interested in (as an individual, partner, stockholder, director, officer, principal, agent, employee, trustee, lender of money or in any other relation or capacity whatsoever) any business which renders services that compete with services provided by TruGreen.

Mantz signed another non-compete agreement in favor of TruGreen in 2003. This New Agreement contained the same non-competition provision as the agreements signed by the New Utah Employees. Namely, it only prohibited Mantz from competing with TruGreen during his employment with TruGreen. Mantz's 2003 Agreement also included the same non-solicitation, non-interference, and non-disclosure provisions contained in the agreements signed by the New Utah Employees.

In January 2006, Mantz received a letter from TruGreen's attorney, Carol Pearson, which requests that Mantz comply with the terms of the agreement that he signed with TruGreen. Pearson attached a copy of the 2003 Agreement to the January letter. Mantz continued to work for Scotts after receiving this letter.

Mantz, in affidavit and deposition testimony, stated that since he began working for Scotts, he has not contacted any person known to him to be a TruGreen customer for the purpose of soliciting the person's business for Scotts. He also testified that he has not encouraged or caused any named employee to contact TruGreen's customers to solicit their business for Scotts.

Lary Gaythwaite was hired by TruGreen in 1998 as a sales representative in its Boise Branch.  Between December 1999 and November 2005, Gaythwaite held a number of job titles with TruGreen, working in branch offices in both Utah and Idaho.  In November 2005, Gaythwaite left TruGreen and accepted a position with Scotts as its Salt Lake City Branch Marketing Manager.

Dave Stephensen and Jim LeBlanc were hired by TruGreen in 1994 and 2001, respectively.  Both were hired as sales representatives, with Stephensen starting his work in TruGreen's Ogden office and LeBlanc working in the Boise branch.  Stephensen worked for TruGreen between 1994 and 1997, and thereafter, from 2000 until January 2006.  LeBlanc worked for TruGreen from 2001 until January 2005.  Both Stephensen and LeBlanc left TruGreen in January 2006, and soon thereafter, started working for Scotts in its Ogden and Salt Lake City franchises, respectively.

During their employment with Scotts, Gaythwaite, LeBlanc, and Stephensen each signed at least two one non-competition agreement in favor of TruGreen.  These agreements contain non-solicitation, non-interference, and non-disclosure provisions that are very similar to the ones contained in the agreements signed by Mantz and the New Utah Employees. However, the non-competition provision in Gaythwaite's most recent agreement, signed in 2004, states that Gaythwaite may not compete with TruGreen for one year following his employment with TruGreen in any geographic area in which he was assigned duties during the last six months of his employment with TruGreen.  Also, the non-competition provision contained in the agreement

11

signed by LeBlanc in 2002, states that LeBlanc may not compete with TruGreen for six months following his employment with TruGreen in any geographic area in which he was assigned duties during the last six months that he was employed by TruGreen.

LeBlanc spent at least the last six months of his employment with TruGreen working at its Ogden branch in Clearfield, Utah.  After leaving TruGreen, LeBlanc began working for Scotts in its Salt Lake branch.  Gaythwaite also spent the last six months of his employment in TruGreen's Ogden office, and after leaving, worked for Scotts in its Salt Lake branch office in Murray, Utah.  There is some testimony stating that Gaythwaite prepared budgets in Salt Lake City during his last six months of employment with TruGreen, and there is testimony that LeBlanc made collection calls out of Salt Lake City during the last six months of his employment at TruGreen.

Stephensen signed an employee confidentiality/non-compete agreement on November 30, 2000, in which he agreed that for the six month period following his termination with TruGreen, he would not work for a company within the same geographic region that was in direct competition with TruGreen.  Stephensen later signed another employment agreement at the request of TruGreen on January 2, 2003.  This contract also included non-disclosure, non-compete, and non-solicitation provisions.  Notably, however, this second contract stated that Stephensen's non-competition agreement was only valid while he was employed with TruGreen.

In January 2006, after they began working for Scotts, Gaythwaite, LeBlanc, and Stephensen all received letters from TruGreen.  Signed by TruGreen's attorney, the letters demand that Gaythwaite, LeBlanc, and Stephensen abide by the non-compete, non-disclosure, and non-solicitation provisions in their contracts.  Enclosed with Pearson's letter to Gaythwaite was his 2004 Agreement; enclosed with Pearson's letter to LeBlanc was the 2002 Agreement; and attached to Stephensen's letter was a copy of his 2003 Agreement.

**The "Idaho Employees"**

In April 2002, TruGreen hired Jason Hiller to work as an aerator in Boise, Idaho.  Three months later, Hiller became a TruGreen telemarketer in the Boise Office, and from August 2002 to February 2004, Hiller worked as a salesman in the Boise office.  From February 2004 to March 2005, Hiller spent time working for TruGreen or its affiliate as a marketing manager in Ogden, Utah, and Twin Falls, Idaho.  For the last nine months that Hiller worked at Trugreen, March 2005 to November 2005, Hiller was a co-marketing manager in the Boise office.  Hiller admits to receiving training from TruGreen, but denies that this training was specialized or unique.  He also admits to watching two training DVDs.  As the marketing manager, Hiller was exposed to customer lists and neighborhood lists used by TruGreen.  During his employment at TruGreen, Hiller signed at least two non-compete agreements, the most recent one dated November 5, 2003.  This agreement included a non-competition provision that reads:

> During the one (1) year period following termination of Employee's employment with TruGreen, Employee will not, within any geographic area in which Employee was assigned duties during the last six (6) months of employment, directly or indirectly becomes interested in (as an individual, partner, stockholder, director,

13

officer, principal, agent, employee, trustee, lender of money or in any other capacity) any work or activity that involves a product, process, service or development which is then competitive with a product, process, service, or development which is regularly used or planned to be used in the operation of TruGreen's business.

Like the agreements signed by the Utah Employees, the agreements signed by the Idaho Employees also contained the non-disclosure, non-solicitation, and non-interference provisions.

Hiller left TruGreen in November 2005 because, among other things, he believed the sales representatives he supervised were overworked and underpaid.  When Hiller resigned, he had a brief conversation with Mitch Smith, in which Smith told Hiller: "You know, I don't care if you compete.  I just ask you that you not harm my business directly."  Soon after leaving TruGreen, Hiller started working for Scotts in Boise, Idaho.

TruGreen hired Clogston, Deerfield, and Van Acker, in 2003, 2004, and 2005, respectively, as sales representatives at its Boise office.  During the fall and winter, these salesmen made telephone sales calls using computer-generated information about prospective customers.  During the spring and summer, they would be handed printed leads generated by TruGreen and they would visit each prospective customer, perform a lawn analysis, and leave the filled-out lawn analysis form for the customer.  These employees had daily sales meetings where they discussed various statistical information.

Tammy Roehr was hired by TruGreen in July 2001, to work as an auditor in TruGreen's Boise office.  In this position, Roehr called people who had placed orders with TruGreen, verified that they had ordered the services shown on the sales sheet, and entered sales information into the computer.  She claims that she received little training when she began her

work as an auditor.  When she started her work as an auditor, she was given a script to use in making calls, and was trained on how to enter sales in to the computer system.

Roehr worked as a commercial administrator in the Boise office from June 2003 to November 2005.  Working in this capacity, Roehr scheduled appointments with TruGreen's commercial customers, sent out invoices, and set up and maintained a filing system for customer contracts.

Each of these employees signed essentially identical non-competition agreements, all of which contained the same non-competition provision quoted above from Hiller's agreement, and the same non-solicitation, non-interference, and non-disclosure provisions included in the Utah Employees' agreements.  Within six months of leaving TruGreen, each of these employees began working for Scotts in the same geographic area where they worked for TruGreen, namely, Boise, Idaho.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]  Courts may appropriately grant summary judgment "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[3]  When a

---

[2] Fed. R. Civ. P. Rule 56(c).

[3] *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

case involves cross-motions for summary judgment, the court "'construe[s] all inferences in favor of the party against whom the motion under consideration is made.'"[4]

## DISCUSSION

The court must determine whether the former employees breached their contracts with TruGreen and whether these former employees and their new employers tortiously interfered with TruGreen's contractual and/or economic relations.  In addressing a motion for a preliminary injunction in this case, the court suggested that the case might possibly be one that could be disposed of on summary judgment in favor of TruGreen.  Having reserved judgment until the issues were fully briefed, the court concludes that this initial assessment has not turned out to be true.  Material issues of fact remain as to the primary players and many of the claims, so TruGreen's case must go to trial.  Nevertheless, the court is prepared to now grant summary judgment for Scotts on three specific claims.

First, the court finds that the New Utah Employees are entitled to summary judgment on TruGreen's claims against them for both breach of contract and intentional interference with existing and prospective economic relations.  Second, the court finds that all of the remaining employee defendants are entitled to summary judgment on TruGreen's claims of intentional interference with existing and prospective economic relations. Third, with respect to TruGreen's contract claims, the court finds that (1) Mantz and Stephensen are entitled to summary judgment

---

[4] *Am. Inv. Fin. v. United States*, 364 F. Supp. 2d 1321, 1323 (D. Utah 2005) (quoting *Pirkheim v. First UNUM Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000)).

on Trugreen's claim for breach of the non-competition provision, (2) LeBlanc, Stephensen, Clogston, Deerfield, Van Acker, and Roehr are entitled to summary judgment on the claim for breach of the non-interference provision, and (3) Mantz, Gaythwaite, LeBlanc, Stephensen, Hiller, Clogston, Deerfield, Van Acker, and Roehr are entitled to summary judgment on TruGreen's claim for breach of the non-solicitation provision.

Also before the court is Scotts' motion to strike TruGreen's expert report and evidence on damages.  Although the court finds that Mr. Elggren is qualified to offer an expert opinion in this case, the court finds that Mr. Elggren's conclusions in this case are not sufficiently reliable to survive scrutiny under Rule 702 of the Federal Rules of Evidence.

The court will first address the three issues on which Scotts' is entitled to summary judgment and will then briefly address the claims for which summary judgment is not appropriate.  Following this discussion, the court will address the issue of damages.

## I.  CLAIMS AGAINST THE NEW UTAH EMPLOYEES

The New Utah Employees, consisting of Spencer, Smith, Egbert, Brower, Coffman, Beck, Murray, and Christensen, are entitled to summary judgment on both of TruGreen's claims against them because: (1) their respective agreements do not prohibit them from competing against TruGreen after ending their employment, (2) TruGreen has failed to produce evidence that these employees breached any of the other clauses in their agreements, and (3) TruGreen has failed not only to demonstrate that the New Utah Employees had any contact with current or former TruGreen customers after starting their work with Scotts, but also that they diverted work from

17

TruGreen to Scotts with an improper purpose or by improper means.  The court will first address the New Utah Employees's motion for summary judgment on the contract claims and then proceed to discuss the tortious interference with economic relations claims.

### A.  Breach of Contract Claims Against New Utah Employees

Because some of the New Utah Employees had signed multiple agreements, the court will address these employees separately from those that signed only one agreement.

1.  *Claims against Spencer, Smith, Egbert, Brower, Coffman, and Beck*

Spencer, Smith, Egbert, Brower, Coffman, and Beck, respectively, all signed one agreement while employed with TruGreen.  Like most of the other agreements at issue in this case, the agreements signed by these defendants contained provisions regarding confidentiality, solicitation, interference, and competition.  As noted above, each of these agreements contained a non-competition provision that restricted the employees from competing with TruGreen only during their employment with TruGreen.  Specifically, the provision reads:

> *During Employee's employment with TruGreen*, the Employee shall not, without the express written approval of TruGreen's President, Chief Operating Officer, or General Counsel, directly or indirectly, own, manage, participate in or otherwise engage or have any connection with any business which provides any service or product that, to the Employee's knowledge, is provided or proposed to be provided by TruGreen.

Because this provision only prohibits its signer from competing with TruGreen *during* the employment, TruGreen cannot successfully assert breach of contract based on their *subsequent* employment with Scotts.  Although the agreements signed by these employees also contained the non-disclosure, non-solicitation, and non-interference provisions that extended beyond the time

of their employment, TruGreen has failed to produce evidence of a disputed material fact as to

whether these defendants breached any of these other provisions.  Moreover, Smith, Spencer,

Egbert, Brower, Coffman, and Beck produced affidavits refuting any allegations that they

breached the respective provisions of their agreements with TruGreen.  Based on this undisputed

evidence, the court concludes that no reasonable juror could find that these defendants breached

their agreements.

2.  *Contract Claims against Christensen, Murray, and Walker*

During their employment at TruGreen, Murray signed three competition and non-compete

agreements, Christensen signed two competition and non-compete agreements, and Walker

signed at least two agreements.  The court finds that the most recent agreements signed by these

defendants supercede their prior agreements because the new agreements appear to fully cover

the subject areas addressed in the old agreements.

Under Utah law, a subsequent contract replaces the terms of a prior contract when (1)

there is an existing valid contract; (2) all parties agreed to a new contract; (3) the new contract

extinguishes the prior contract; and, (4) the new contract is valid.[5]  In order for a contract to be

merged into another, it must be "plainly shown that such was the intent of the parties; and this is

usually where the later contract fully covers an earlier one . . . ."[6] Citing Idaho law, defendants

provide additional insights as to when a subsequent agreement completely supplants a prior one,

---

[5] *Ford v. Am. Exp. Fin. Advisors, Inc.*, 98 P.3d 15, 22 (Utah 2004); Restatement (Second) of Contracts § 279 (1981).

[6] *Horman v. Gordan*, 740 P.2d 1346, 1351 (Utah Ct. App. 1987) (citation omitted).

noting that the new contract must either explicitly rescind the earlier contract, deal with the subject matter of the former contract so comprehensively as to be complete within itself and to raise the legal inference of substitution, or present such inconsistencies with the first contract that the two cannot in any substantial respect stand together.[7]

The most recent agreements signed by Christensen, Murray, and Walker, not only appear to fully cover their respective earlier agreements, but the new agreements appear to be at odds with the earlier agreements, specifically with regard to the six-month covenant not to compete, which is contained in the earlier agreements.  TruGreen contends that the new agreements do not fully cover the previous agreements because the "modified non-compete Agreements contain no provision or references whatsoever to a post-termination covenant that would supercede or extinguish the prior six-month covenants."[8]  The court is unpersuaded by this argument.  Both the old and new agreements contained non-competition provisions, the primary difference being that the new agreements only prohibited competition during the time the defendants were employed at TruGreen.  Put another way, the new agreement covered the exact same subject matter (non-competition) with a variation on the time involved.

If there were any doubt on this issue, the letters from TruGreen's legal counsel resolve them.  The letters remind their recipients that they signed a non-competition agreement while working at TruGreen, and attached to the letter, were copies of the new agreements, and only the

---

[7] *Silver Syndicate, Inc. v. Sunshine Min. Co.*, 611 P.2d 1011, 1020 (Idaho 1979).

[8] Def.'s Mem. Opp. Summ. J. 26.

new agreements, signed by these defendants.  While these letters arguably estop TruGreen from

contending that two separate agreements exist, the simpler route to the same destination is to

simply treat these letters as undisputed evidence that TruGreen itself viewed the early agreements

as having been superceded.  Consequently, the court finds that the new agreements are the

controlling documents and they do not prohibit competition after leaving TruGreen.

Therefore, the court grants summary judgment to Christensen, Murray, and Walker on

TruGreen's breach of contract claim.

### B. Tortious Interference Claims Against All New Utah Employees

The New Utah Employees are also entitled to summary judgment on TruGreen's claim of

intentional interference with economic relations because TruGreen has failed to produce

evidence that the New Utah Employees have contacted anyone known to them to be a current or

former TruGreen customer, let alone shown that the New Utah Employees diverted work from

TruGreen because of a desire to harm their former employer.

Under Utah law, the tort of intentional interference with economic relations requires

proof of three elements: (1) that the defendant intentionally interfered with the plaintiff's existing

or potential economic relations, (2) for an improper purpose or by improper means, (3) causing

injury to the plaintiff."[9]  The Utah Supreme Court has recently explained that a plaintiff satisfies

the second requirement by establishing either improper purpose or improper means.[10]  A plaintiff

---

[9] *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 302 (Utah 1982); *see also Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 331 (Utah 2005).

[10] *Anderson,* 116 P.3d at 331.

seeking to show improper purpose must show that defendant's predominant purpose of interfering was to injure the plaintiff, and in this case, it would mean that the desire to harm TruGreen predominated over legitimate economic motivations.  A plaintiff must show that the defendant was maliciously motivated, "in the sense of spite and a desire to do harm to the plaintiff for its own sake."[11]  To show improper means, a plaintiff must demonstrate that the "means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law-rules" including intimidation, deceit, misrepresentation, defamation, or disparaging falsehood.[12]

It is not necessary to devote much discussion to the question of the New Utah Employees' potential liability for tortious interference because no evidence suggests that their diversion of work, if any, was motivated by a desire to injure TruGreen for the sake of injury.  Nor has TruGreen demonstrated that the interference by theses particular employees, if any, occurred through improper means.  TruGreen's failure to even address the New Utah Employees's motion for summary judgment is yet another ground to grant summary judgment for defendants on this claim, as well as the contract claims.  For the most part, the parties' assiduous briefing has been exceptionally thorough, and the court recognizes the difficulty in adequately addressing in a single memorandum, numerous claims against numerous defendants.  Nevertheless, it is not the

---

[11] *Sampson v. Richins*, 770 P.2d 998, 1003 (Utah Ct. App. 1989).

[12] *Id.*; *see also St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991).

job of the court to construct a party's arguments for him.[13]  TruGreen has failed to supply the court with evidence of these defendants' breach of contract or tort, not only in its opposition to defendants' motion for summary judgment, but even in its own motion for summary judgment.

Accordingly, the court grants summary judgment for the New Utah Employees, and dismisses them from the case.[14]

## II. TORTIOUS INTERFERENCE CLAIMS AGAINST REMAINING EMPLOYEE DEFENDANTS

In its third cause of action, TruGreen alleges that all defendants intentionally interfered with its existing and prospective economic relations.[15]  The court finds that the remaining defendant employees in this case (Mantz, Hiller, Clogston, Deerfield, Van Acker, Roehr, Gaythwaite, Stephenson, and LeBlanc) are entitled to summary judgment against TruGreen on these claims, primarily for the same reasons why the New Utah Employees are entitled to summary judgment: there is little evidence of actual contact with TruGreen customers, and even where contact or diversion is possibly shown, no reasonable juror could conclude from the evidence supplied that any contact or diversion was done with an improper purpose or by improper means, as required by both Utah and Idaho law.

---

[13]*See Perry v. Woodward*, 199 F.3d 1126, 1141 (10th Cir. 1999).

[14] At oral argument on this matter, TruGreen conceded that it would not contest the grant of summary judgment on these "little fish" in this case.  The court directs briefing on the issue of whether the dismissed defendants are entitled to attorneys' fees below.

[15] Amend. Compl. ¶¶ 133-38.

At the heart of TruGreen's claims of tortious interference with economic relationships is the allegation that the defendants diverted work away from TruGreen and toward Scotts.[16] Although it is disputed whether Scotts targeted TruGreen's customers or attempted to solicit business from persons known to be TruGreen's customers, the evidence produced by TruGreen to show this contact is minimal.  As is more fully discussed below, most of the "evidence" of contact is no more than a few isolated contacts, sprinkled with admissions that the Scotts employees may have spoken with TruGreen customers during their work at Scotts.

Because Utah and Idaho have different standards for tortious interference of economic relations, the court will apply each of these laws where appropriate, but the end result on these claims is the same.

### A.  Utah Tortious Interference Claims - Mantz, Gaythwaite, Stephensen, LeBlanc

The parties agree that the tortious interference claims against Mantz, Gaythwaite, Stephensen, and LeBlanc are governed by Utah law.  As explained above, there are three elements to the tort of intentional interference with economic relations under Utah law, namely: (1) that the defendant intentionally interfere[s] with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."[17]

At the heart of this issue is whether Scotts acted for an improper purpose or by improper means.  Under Utah law, a plaintiff seeking to show improper purpose must show that

---

[16] *Id.*

[17] *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 302 (Utah 1982); *see also Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 331 (Utah 2005).

defendant's predominant purpose for interfering was to injure the plaintiff; in this case, TruGreen must prove that these employees' desire to harm TruGreen predominated over their motive to profit.  In other words, TruGreen must show that these defendants were maliciously motivated, "in the sense of spite and a desire to do harm to [TruGreen] for its own sake."[18]  Alternatively, TruGreen could prevail by showing these defendants used improper means.  To show improper means, a plaintiff must demonstrate that the "means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law-rules" including intimidation, deceit, misrepresentation, defamation, or disparaging falsehood.[19]

Although Mantz, Gaythwaite, Stephensen, and LeBlanc appear to have had more experience and been more senior in status than their New Utah Employee colleagues at TruGreen, the facts show that these defendants had little to no contact with current or former TruGreen customers once they started working for Scotts.  Moreover, TruGreen has failed to raise a disputed material fact with regard to whether these defendants acted with an improper purpose or by improper means.  In fact, a close examination of the deposition testimony used to support TruGreen's position that these employees tortiously interfered with its economic relations reveals nothing of substance.  Stephensen's deposition indicates:

> Q: Since terminating employment with TruGreen and working with Scotts, have you ever contacted any customer of TruGreen in the Ogden area?

---

[18]*Sampson v. Richins,* 770 P.2d 998, 1003 (Utah Ct. App. 1989).

[19] *Id.* at 1003; *see also St. Benedict's*, 811 P.2d at 201.

A: Not to the best of my knowledge

Q: Anybody else that you know?

A: My dad and mom

Q: Anybody else that you know?

A: No.  Well, not to my recollection.

Q: Is it possible you could have spoken with former or current TruGreen customers while you were working with Scotts?

A: When I was at Scotts?

Q: Yeah, while you're at Scotts.

A: Not that I know of.

. . . .

Q: You have no way of knowing either way?

A: No.[20]

LeBlanc's deposition indicates:

Q: Do you know if some of the clients that you've contacted on the commercial side were former TruGreen clients?

A: I've never contacted anybody.

Q: Do you know if some of the clients that you have sold or provided services to on the commercial side were former TruGreen customers?

A: I have no idea if that's true or not.

---

[20] Stephensen Dep. 89:5-90:5.

Q: So it may be true.  You just don't know?

A: Correct.[21]

At most, the depositions show that it was possible that Stephenson and LeBlanc had spoken with current or former TruGreen customers.[22]  Mantz, since he began work at Scotts, has only spoken with two customers, and they were not, to his knowledge, TruGreen customers. Gaythwaite testified in his deposition that he "has not had any communication with, you know, current or past TruGreen customers after-the-fact, no, not at all."[23]  TruGreen as the plaintiff, however, has the burden of proving actual interference.  Moreover, it is an unreasonable leap to suggest that this deposition testimony, even combined with the other facts and inferences suggested by TruGreen, demonstrates that the employees were acting for the predominant purpose of injuring TruGreen, or that their contacts with these customers were done through improper means as defined under Utah law.  Accordingly, the court finds that these defendants should be granted summary judgment on TruGreen's claims of intentional interference with economic relations.

---

[21] LeBlanc Dep. 87:23-88:7.

[22] The court is aware of Byron Smith's deposition testimony in which he said that his retention manager said that former TruGreen customers said that LeBlanc said that "he worked at TruGreen and that he is now at Scotts and would like them to come over." B. Smith Dep. 135:19-24.  The court grants TruGreen's motion to strike this statement because the statement is triple hearsay and TruGreen did not address the statement in its opposition.  Even if the court considered the statement, it fails to raise an issue of material fact with respect to LeBlanc's improper purpose or improper means.

[23] Gaythwaite Dep. 189:22-24.

### B.  Idaho Tortious Interference Claims – Hiller, Clogston, Deerfield, Van Acker, Roehr

The parties agree that the tortious interference claims against Hiller, Clogston, Deerfield, Van Acker, and Roehr are governed by Idaho law.  Under Idaho law, a plaintiff alleging tortious interference with economic relations must demonstrate that (1) there exists a valid economic expectancy or contract, (2) of which the defendant has knowledge, (3) that the defendants intentionally interfere with, thereby inducing termination or breach, (4) for an improper purpose or by improper means, (5) thereby resulting in damage to the plaintiff.[24]  Clarifying element number four, Idaho courts require a plaintiff alleging tortious interference with economic relations to show that "any claimed intentional interference with prospective economic advantage resulting in injury to the plaintiff is wrongful by some measure beyond the fact of the interference itself."[25]  Despite this somewhat "lower standard" than Utah law, the facts of this case still warrant granting summary judgment in favor of the Idaho Employees on these claims.

Much like the deposition testimony used to support its claim against the Utah Employees, TruGreen's deposition testimony offered in support of its claims against the Idaho employees fails to raise a material issue of fact that would preclude summary judgment on these issues.  The Clogston deposition indicates:

> Q: Do you know whether any of the customers you currently provide service
> to at Scotts were former customers of TruGreen?

---

[24] *Highland Enter., Inc. v. Barker*, 986 P.2d 996, 1004 (Idaho 1999).

[25] *Idaho First Nat'l Bank v. Bliss Valley Foods*, 824 P.2d 841, 861 (Idaho 1991) (citation omitted).

A: Yes

Q: In fact, some of them were, were they not?

A: Yes[26]

The Deerfield deposition indicates:

Q: Have you ever fielded calls of any TruGreen customers, to the best of your knowledge?

A: Yes, I have.

Q: Did they explain to you that they were current TruGreen customers when they called you?

A: Not – maybe during the course of the conversation that would come up, but I don't recall anybody calling saying, I am a TruGreen customer and I want to talk to you.

Q: How would you come up that they were a TruGreen customer?

A: I would ask them if they've had lawn care service in the past or if they traditionally take care of the lawn themselves just to get an idea as to how best to approach.   You know, if they have had a lawn care company, then I generally wouldn't have to explain exactly how lawn care companies work, I would just talk to them about Scotts.

Q: Do you ask them how long they had been a customer of TruGreen?  Is that part of the sales call?

A: I don't generally ask them that.[27]

The Van Acker deposition indicates:

_____

[26] Clogston Dep. 72:16-21.

[27] Deerfield Dep. 65:20-66:16.

Q: As a Scotts sales representative have you ever communicated with a TruGreen customer, either past or present, who you formally solicited yourself as a TruGreen employee?

A: Yes.

Q: How many times has that happened?

A: Well, two neighbors and one customer who is very demanding, who I did not contact to sell her Scotts products, however, to let her know who to contact at TruGreen for any questions or concerns she had throughout the season.

Q: This is what you told her while you were working for TruGreen?

A: While I was working for Scotts.

Q: Okay

A: She was a very demanding customer.

Q: And she subsequently called you back at Scotts?

A: She is also a neighbor at – she is not only a customer but we have developed a good friendship over the years. We live on the same street – or my wife's family has a place in McCall, they live on the same street, you know, we see each other in passing, you know, hi, how are you doing.  We became good friends.

Q: Did she say why she switched to Scotts Lawn Service?

A: She was not happy with the TruGreen service or was ready for a change. One of those; I don't recall.

Q: Did she know that you worked for Scotts at that time when she called you back?

A: She did.  I – when I – yes.

Q: At which point she switched from TruGreen to Scotts after talking to you?

A: She wanted to see what we had to offer.

Q: What's this individual's name?

A: Her name is Tammy Conrad.[28]

Once again, the testimony of these defendants, coupled with their history and experience at Trugreen may raise an issue of material fact with regard to the first element (actual interference), but nothing provided by TruGreen raises a disputed fact as to whether the conduct was done with an improper purpose or by improper means. Accordingly, the court grants the Idaho Employees summary judgment on TruGreen's claim of intentional interference with economic relations.

## III. CONTRACT CLAIMS AGAINST EMPLOYEE DEFENDANTS

Each of the agreements signed by the employee defendants contained similar provisions. The court finds that summary judgment is appropriate on the following claims: (1) Mantz and Stephensen are entitled to summary judgment on Trugreen's claim for breach of the non-competition provision because, even if their most recent non-compete agreements are enforceable under Utah law, both provisions do not prohibit post-employment competition; (2) LeBlanc, Stephensen, Clogston, Deerfield, Van Acker, and Roehr are entitled to summary judgment on the claim for breach of the non-interference provision because there is no evidence that these defendants induced or encouraged TruGreen employees to leave TruGreen; (3) Mantz, Gaythwaite, LeBlanc, Stephensen, Hiller, Clogston, Deerfield, Van Acker, and Roehr are entitled to summary judgment on TruGreen's claim for breach of the non-solicitation provision because

---

[28] Van Acker Dep. 39:1-40:13.

there is no evidence that these employees solicited or contacted TruGreen customers with whom they had actual contact while employed by TruGreen.

### A.  Breach of the Non-Competition Provision

Mantz and Stephensen are entitled to summary judgment with respect to the non-competition provision because their most recently signed agreements do not prohibit post-employment competition. Under Utah law, as explained above, a subsequent contract replaces the terms of a prior contract when (1) there is an existing valid contract; (2) all parties agreed to a new contract; (3) the new contract extinguishes the prior contract; and, (4) the new contract is valid.[29]  In order for a contract to be merged into another, it must be "plainly shown that such was the intent of the parties; and this is usually where the later contract fully covers an earlier one . . . ."[30]  A close examination of the "old" and "new" contracts signed by both Mantz and Stephensen reveals that although they both contained non-competition provisions, the new agreements only prohibited competition during the time the defendants were employed at TruGreen.  Put another way, the new agreements covered the exact same subject matter (non-competition) with a variation on the time involved.  Also, as the court noted above, TruGreen's letters to Mantz and Stephensen are undisputed evidence that TruGreen itself viewed the early agreements as having been superceded.  Consequently, the court finds that the new agreements are the controlling documents and that they do not prohibit competition after leaving TruGreen.  The court reaches

---

[29] *Ford v. Am. Exp. Fin. Advisors, Inc.*, 98 P.3d 15, 22 (Utah 2004); Restatement (Second) of Contracts § 279 (1981).

[30] *Horman v. Gordan*, 740 P.2d 1346, 1351 (Utah Ct. App. 1987) (citation omitted).

this conclusion without deciding whether the non-competition provision is enforceable under Utah law.

### B.  Breach of the Non-Interference Provision

LeBlanc, Stephensen, Clogston, Deerfield, Van Acker, and Roehr are entitled to summary judgment on the claim for breach of the non-interference provision because there is no evidence that these defendants induced or encouraged any TruGreen employees to leave TruGreen or go to work for Scotts.  Each of these named defendants have provided affidavit testimony that they did not induce or encourage any TruGreen employee to terminate his or her employment with TruGreen or go to work for Scotts, or breach any agreement they had with TruGreen.  TruGreen failed to respond to these defendants' motion for summary judgment on this claim, and has otherwise failed to produce evidence contradicting the affidavit testimony of these defendants.

### C.  Breach of the Non-Solicitation Provision

Mantz, Gaythwaite, LeBlanc, Stephensen, Hiller, Clogston, Deerfield, Van Acker, and Roehr are entitled to summary judgment on TruGreen's claim for breach of the non-solicitation provision because there is no evidence that these employees solicited or contacted TruGreen customers with whom they had actual contact while employed by TruGreen.  Each of the named defendants have testified that, since going to work for Scotts, they have not contacted any person known to them to be a TruGreen customer for the purpose of soliciting the person's business for Scotts.  As has been outlined above, TruGreen has presented deposition testimony that

demonstrates that some of these defendants may have done so, but TruGreen has failed to present any admissible evidence to refute the testimony of these defendants on this issue.

## IV.  OTHER CLAIMS

### A.  Contract Claims

The court finds that disputed material facts remain with respect to the following claims and following defendants: (1) breach of the non-competition provision as to Gaythwaite, LeBlanc, Hiller, Clogston, Deerfield, Van Acker, Roehr; (2) breach of non-disclosure provision as to Mantz, Gaythwaite, LeBlanc, Stephensen, Hiller, Clogston, Deerfield, Van Acker, and Roehr; and (3) breach of non-interference provision as to Mantz, Gaythwaite, and Hiller.  The enforceability of the non-competition provisions under both Utah and Idaho law is a mixed question of fact and law and will need to be further developed at trial.

### B.  Tort Claims

The court finds that disputed material facts remain as to the following tort claims: (1) tortious interference with economic relations claim against Mower Brothers, Scotts, Greenside, Bitton, and Babilis; (2) tortious interference with contractual relations against Mower Brothers, Scotts, Bitton, Babilis, Mantz, Hiller, and Gaythwaite, and (3) unfair competition claim against Mower Brothers, Scotts, Greenside, Bitton, and Babilis.

## IV.  DAMAGES

The court will first address defendants' motion to strike TruGreen's expert report and evidence of damages and will then turn to the issue of punitive damages.  Also, the court directs additional briefing from the parties with respect to attorneys' fees.

### A.  Motion to Strike Expert Report and Evidence of Damages

Scotts urges this court to strike Mr. Elggren's report and exclude Mr. Elggren from giving an opinion at trial regarding TruGreen's alleged damages or lost profits.  Scotts argues Mr. Elggren is not qualified to render the expert opinion expressed in his report and the evidence proffered is not reliable.  Although the court finds that Mr. Elggren is qualified to offer an expert opinion in this case, the court also finds that Mr. Elggren's conclusions in this case are not sufficiently reliable to survive scrutiny under Rule 702 of the Federal Rules of Evidence.

It is the duty of the trial judge to ensure that any scientific evidence or testimony is both relevant and reliable before it is admitted into evidence.[31]  This same gate-keeping function also applies to testimony and evidence based on "technical" and "other specialized" knowledge.[32]  Based on *Daubert*, Rule 702 provides general standards for trial courts to use in assessing the reliability and helpfulness of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts

---

[31]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

[32]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[33]

In other words, experts must identify the facts and data forming the basis for their testimony so courts can assess the sufficiency of the facts and data.  And to be admissible, experts must base their opinions on scientific methods and procedures, not mere subjective belief or unsupported speculation.  The court may exclude evidence where it finds "an impermissible analytical gap exists between the premises and conclusion."[34]  And it is the burden of the proponent of the evidence to establish that the requirements for its admissibility have been met, by a preponderance of the evidence.[35]

Scotts challenges Mr. Elggren's expertise as well as the reliability of his report. Accordingly, the court must determine whether Mr. Elggren is qualified by knowledge, skill, experience, training, or education to render an opinion in this case, and if the court finds Mr. Elggren qualified, it must determine whether his opinions are reliable under the appropriate standard.[36]

First, Scotts claims that Mr. Elggren is not sufficiently qualified to offer expert opinions. The court disagrees.  Mr. Elggren received his masters in business administration from the

---

[33] Fed. R. Evid. 702.

[34] *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (citation and internal quotations omitted).

[35] *See Bourjaily v. Untied States*, 483 U.S. 171, 175 (1983).

[36] *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

University of Utah in 1977, and has twenty-five years of experience in public accounting.  Mr. Elggren is a certified public accountant, a certified fraud examiner, and a certified insolvency and reorganization advisor.  He has testified concerning the value of assets, liabilities, or businesses, and has qualified to testify on damages, valuation, accounting, bankruptcy, and other financial matters in state and federal courts.

Scotts concedes that Mr. Elggren has significant experience regarding forensic accounting and bankruptcy issues but argues that this experience and background is fundamentally different from experience regarding valuation, lost profits, and goodwill valuations.  Scotts points to the fact that Mr. Elggren lacks the business valuation certifications that indicate expertise and ability in evaluating and analyzing markets.  Although the court recognizes that Mr. Elggren may not have the ideal background for providing damages analysis in this case, his lack of certain training or certification does not necessarily mean that he does not have the required expertise.  The court finds that TruGreen has established that Mr. Elggren is qualified to perform, supervise, and render opinions regarding damages analysis.

Second, and more seriously, however, Scotts claims that Mr. Elggren's conclusions in this case are not sufficiently reliable to survive scrutiny under Rule 702 of the Federal Rules of Evidence.  Having reviewed the matter carefully, the court agrees with Scotts.

 The fundamental problem is that TruGreen has not explained how Mr. Elggren could reliably determine that profits earned by Scotts were in fact stolen away from TruGreen.  So far as the court can determine from reviewing his report, Mr. Elggren essentially assumed that the

growth in Scotts profits were as a result of the new employees who left TruGreen.  There are a number of problems with this approach.  For starters, Mr. Elggren picks 30% as the percent of customers that Scotts was able to retain as a result of TruGreen employees.  The basis for this figure is not revealed, other than to say it is an "estimate."[37]  A better term, so far as the court can tell, is a "guesstimate."[38]  While this guesstimate might be within the realm of reason, Rule 702 requires more.  In order to be admissible, Elggren's report must be reliable under the principles outlined in *Daubert,* including "(1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."[39]  The court has been given no reason from Mr. Elggren's report to accept the 30% figure, other than that appears to be about how much Scotts' profits increased in the year 2006 as opposed to 2005.[40]  But this methodology does nothing more than assume the conclusion -- that is, to assume that profits gained by Scotts came from the new employees.

---

[37]  F. Wayne Elggren, Calculation of Damages, December 4, 2006, ("Elggren Report") at 7.

[38]  *See* Dictionary.com (to "guesstimate" is "to estimate without substantial basis in facts or statistics").

[39]  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (citing *Daubert*, 509 U.S. at 593-94).

[40]  *See* Elggren Report at 7 (noting that there was in increase in revenue of 38% in 2006 compared to 4% in 2005).

As a separate and independent reason for rejecting this testimony, the court finds that the report does not seriously contend with potentially confounding causes of revenue gains and losses.  For example, the defendants have offered as an undisputed fact (and TruGreen has not contested) that various factors would have to be taken into account in developing such a calculation.  These undisputed relevant factors are:

a.    The specific items of confidential information that allegedly were taken by each Defendant who previously worked for TruGreen, including the impact that the use of each specific element of the confidential information could have on alleged damage elements including sales, profits, margins, expenses, and management efficiencies.

b.    Historical patterns of financial performance by TruGreen and how performance allegedly was impacted by the Defendants' alleged acts.

c.    Identification of which customers TruGreen allegedly lost to Mower Bros. as a result of the actions of the Defendants, or which customers allegedly were obtained by Mower Bros. as a result of allegedly using Trugreen's confidential information, utilizing the customer databases from both TruGreen and Mower Bros.

d.    Analysis that would show that but for the actions of the Defendants, TruGreen would have obtained the revenues obtained by Mower Bros.

e.    The dates that each defendant quit TruGreen and/or their subsequent hire date at Mower Bros. and the impact each Defendant allegedly caused to damages.

f.    The effect of TruGreen's Ogden location closing and its impact on both Defendants' decision to leave TruGreen and damages allegedly resulting therefrom.

g.    Alternative reasons for TruGreen's decreased sales and profitability in 2006, including levels of advertising, weather, regional economic factors, population growth, publicity, market acceptance of products and services, business life cycle issues, pricing differences, competitive forces, quality of products and customer services, and management decisions.

h.   Alternative reasons for Mower Bros.' increased sales and profitability in 2006, including levels of advertising, weather, regional economic factors, population growth, publicity, market acceptance of products and services, business life cycle issues, pricing differences, competitive forces, quality of products and customer services, and management decisions.

i.   Alternative reasons as to why Mower Bros. was able to retain customers in 2006 that it obtained in 2005 other than by using confidential information from defendants, including levels of advertising, weather, regional economic factors, population growth, publicity, market acceptance of products and services, business life cycle issues, pricing differences, competitive forces, quality of products and customer services, and management decisions.[41]

The defendants have also proffered, as undisputed facts, that "[a]ll of these issues directly relate to a proper assessment of damages and impact the calculation of damages. These issues are not adequately addressed, or were not considered by Mr. Elggren in preparing his report."[42] In its response, TruGreen has not challenged these facts. Therefore, by rule,[43] these facts are admitted for purposes of the motion. In light of those undisputed facts, the court is required to conclude that Mr. Elggren's report is not reliable.

In addition, a change in the circumstances of this case renders the report speculative. TruGreen has recently stipulated to the dismissal of nine employees. While these were more lower-level employees, surely, if Mr. Elggren's theory is true, they had at least some role in the increased profits. His report indicates that it is based on the damage caused by all eighteen

---

[41]   Def.'s Mem. Supp. Mot. to Strike ¶ 24.

[42]   *Id.* ¶ 25 (citations to Rasmussen affidavit omitted).

[43]   DUCivR 56-1(c).

employees originally sued in this case.  Therefore, the court lacks admissible evidence of what damage is attributable to the nine employees remaining in this case.

Finally, TruGreen argues briefly in its response brief that its goodwill has been damaged by the defendants' action, as proven by a franchise agreement between Scotts and the defendants. It may well be that plaintiff's goodwill has been damaged.  The narrow question before the court, however, is whether Mr. Elggren's report is sufficiently reliable to be admitted as evidence in support of the *amount* of damages.  Nothing in Mr. Elggren's report, at least as argued in the briefs before the court, gives the court sufficient confidence to admit it on the subject of damage to goodwill.  Again, the defendants have addressed this point as an undisputed fact – without specific response from TruGreen.  The defendants urge (correctly so far as the court can ascertain) that a goodwill calculation requires the expert to "account for any intervening factors or causes that may have otherwise impacted the difference in the value of the goodwill."[44]  Yet nothing in Mr. Elggren's report does that.

Support for the court's conclusion comes from *Storage Tech. Corp. v. Cisco Systems, Inc.*[45]  In *Storage Technology*, the court upheld the district court's grant of summary judgment for Cisco on Storage Technology's claims of interference with contractual relations, inducing breach of contract, corporate raiding, conversion, misappropriation of trade secrets, and breach of fiduciary duties, because Storage Technology failed to produce evidence supporting any amount

---

[44] Def.'s Mem. Supp. Mot. to Strike ¶ 43.

[45] 395 F.3d 921 (8th Cir. 2005).

of damages or restitution.[46]  The dispute arose out of NuSpeed Internet Systems' hiring of a

number of Storage Technology's employees.  Storage Technology's expert, George Norton,

calculated a restitutionary remedy for the alleged damages stemming from this employee shift of

$450 million – the exact amount for which Cisco purchased NuSpeed.[47]  Finding Norton's report

to be too speculative to be admissible, the court noted:

> The first and most apparent problem with Norton's testimony is that he attributed the
> entire value of the NuSpeed acquisition to employees and trade secrets wrongfully
> appropriated from Storage Technology, even though NuSpeed had other assets and
> employees.  Norton did not attempt to value the people or the technology supposedly
> belonging to Storage Technology by any means other than by ascertaining what price
> Cisco paid for NuSpeed.[48]

Like the expert in Storage Technology, Mr. Elggren has not attempted to value the goodwill

supposedly belonging to TruGreen by any other means other than by pointing to a franchise

agreement between Mower Brothers and Scotts.

   In reaching its conclusion, the court is aware that the plaintiff has not had an opportunity

to depose the defense expert, Mr. Rasmussen.  However, none of the court's conclusions could

be affected by cross-examination of Mr. Rasmussen.  The undisputed facts recounted above,

while relying on Mr. Rasmussen's affidavit for support, have not been challenged by TruGreen.

Therefore, they are deemed admitted, regardless of what subsequent evidence TruGreen might

---

[46] *Id.* at 929.

[47] *Id.* at 926.

[48] *Id.*

develop.  Put another way, the problem here is TruGreen's failure to develop its affirmative case, rather than the need for Scotts to develop some case of its own.

In light of these facts, the court will preclude damage testimony from Mr. Elggren at trial. The question then arises as to whether this entire case must be dismissed.  The court's tentative impression is that it need not be dismissed, as the plaintiff might be able to prove nominal damages or perhaps some form of restitutionary damages in other ways.  The court trusts, however, that the parties will brief this point in pre-trial submissions so that the court may have a fuller understanding of this issue before ruling.

### B. Punitive Damages

The court finds that TruGreen is precluded from seeking punitive damages in this case. Punitive damages are reserved for cases where the defendant's conduct was "willful or malicious."[49]  The Utah Court of Appeals, in *Promax Development Co. v. Mattson*, upheld a district court's denial of punitive damages in an intentional interference with economic relations case, even though the district court expressly found that ProMax acted maliciously.[50]  The *Promax* court noted that "where a party prevails on an interference with prospective economic relations claim based on the improper purposes alternative of recovery, that party must show additional aggravating circumstances to recover punitive damages."[51]   Also, as correctly pointed

---

[49] *Nelson v. Jacobsen*, 669 P.2d 1207, 1219 (Utah 1983).

[50] 943 P.2d 247, 260 (1997).

[51] *Id.*

out by the defendants, "punitive damages are reserved for the most unusual and compelling circumstances."[52]  "There must be some element of outrage normally present in the commission of crimes or intentional torts."[53]

TruGreen has failed to demonstrate additional aggravating circumstances, and the facts of this case are not so unusual or outrageous as to justify punitive damages.  Consequently, the court eliminates punitive damages as a form of potential recovery for TruGreen.

## C.  Future Briefing

In light of the court's ruling on damages, the court expects additional briefing on the implications of the exclusion of Mr. Elggren.  In particular, the court would appreciate briefing on whether the entire case must now be dismissed or whether plaintiff can prove damages in other ways.  The court also expects briefing on whether the dismissed defendants are entitled to attorneys' fees.  These, and all other issues regarding damages, will be discussed at the damages hearing scheduled for February 28, 2007, at 10:30 a.m.

## CONCLUSION

Accordingly, the court GRANTS in part and DENIES in part Scotts' motion for summary judgment (#175; #181; #183; #185; #187) and GRANTS Scotts' motion to strike TruGreen's expert report and evidence of damages (#202).  The court DENIES TruGreen's motions for

---

[52] *Hatfield v. Max Rouse & Son Northwest*, 606 P.2d 944, 955 (Idaho 1980).

[53] *Dunn v. Ward*, 670 P.2d 59, 62 (Idaho Ct. App. 1983).

summary judgment (#151 and #177).  Defendants' various motions to strike are MOOT (#217;

#228; #245), unless specifically addressed herein.

      SO ORDERED.

      DATED this 13th day of February, 2007.

                  BY THE COURT:

                  _____

                  Honorable Paul G. Cassell
                  United States District Judge